**FORD MOTOR COMPANY and T. A. Andrews Pontiac, Olds, Cadillac, Inc., Appellants,**

v.

**Frank NOWAK and Eloise Nolan, Appellees.**

No. 1834.

Court of Appeals of Texas, Corpus Christi.

June 30, 1982.

Rehearing Denied Sept. 2, 1982.

William C. Slusser, Randall A. Hopkins, Baker & Botts, Houston, R. D. Cullen, Cullen, Carsner, Seerden & Williams, Victoria, Rick Rogers, Porter, Gonzalez & Rogers, Corpus Christi, for appellants.

John O'Quinn, Murphrey, O'Quinn & Cannon, Houston, Russell H. McMains, Edwards & Perry, Corpus Christi, for appellees.

Before NYE, C. J., and BISSETT, YOUNG, UTTER, KENNEDY, and GONZALEZ, JJ., En Banc.

## OPINION

UTTER, Justice.

This is a products liability case. The suit arose as a result of an auto accident in which Mrs. Ann Nowak was killed. There were no eyewitnesses to the accident; however, it was agreed that when the accident was discovered, the body of the decedent, Mrs. Ann Nowak, was found underneath her 1977 Ford automobile, which was the only vehicle involved. As a result of this

accident, Frank Nowak, the deceased's husband, filed suit against appellant Ford Motor Co., et al., seeking wrongful death and punitive damages.

■ The case was submitted to the jury on special issues from which the jury found, inter alia, that 1) the transmission control system of the Nowak Ford was defectively designed; 2) this defective design was a producing cause of the accident; 3) the shift lever on the Nowak Ford could be left in a position which appeared to the driver to be the proper position when it was possible for vehicle vibration to move the transmission into reverse in an unattended vehicle; and 4) that Ford failed to adequately warn its consumers about this problem. The jury further found pecuniary damages in the amount of $400,000 and punitive damages in the amount of $4,000,000. The trial court entered judgment for appellee in accordance with the jury verdict. Ford duly perfected this appeal.

Ford, in its first and sixth points of error, argues that the jury findings on design defect are "against the great weight and preponderance of the evidence". In reviewing an "against the great weight and preponderance of the evidence point", we must consider all of the evidence, including evidence which tends to prove the existence of vital facts as well as evidence which tends to disprove its existence. If a jury finding, considering all of the evidence of probative value, is so contrary to the weight and preponderance of the evidence as to be clearly wrong and unjust, we should sustain the point, reverse the judgment of the trial court and remand the case for a new trial. This is true even if the verdict is supported by more than a scintilla of evidence, and even though reasonable minds could differ about the conclusion to be drawn from the evidence. Otherwise, this Court should overrule the point and affirm the judgment. *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); *Sam Kane, Inc. v. Mathisen,* 504 S.W.2d 804 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.). *Ruiz v. Flexonics,* 517 S.W.2d 853 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.); Calvert,

"No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 359 (1960); Garwood, The Question of Insufficient Evidence on Appeal, 30 Texas L.Rev. 803 (1952).

■ In addition to these well-established review guidelines, a products liability cause of action also requires consideration of the following: Whether a product is defectively designed requires the jury to balance the product's utility against the likelihood of and the gravity of injury from its use. The finding on defectiveness may be influenced by evidence of a safer design that would have prevented the injury. *Turner v. General Motors Corporation,* 584 S.W.2d 844 (Tex.1979); *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743 (Tex.1980); *Burks v. Firestone Tire & Rubber Company,* 633 F.2d 1152 (5th Cir. 1981). *Bell Helicopter Co. v. Bradshaw,* 594 S.W.2d 519 (Tex.Civ.App.— Corpus Christi 1980, writ ref'd n.r.e.). Since defectiveness of the product in question is determined in relation to safer alternatives, the fact that risks could be diminished easily or cheaply may influence the outcome of the case. *Boatland of Houston, Inc. v. Bailey,* supra.

The following synopsis on how to judge whether or not a product was defectively designed was aptly stated in *Boatland.* In that case, the Supreme Court stated:

"Whether a product was defectively designed must be judged against the technological context existing at the time of its manufacture. Thus, when the plaintiff alleges that a product was defectively designed because it lacked a specific feature, attention may become focused on the feasibility of that feature—the capacity to provide the feature without greatly increasing the product's cost or impairing usefulness. This feasibility is a relative, not an absolute, concept; the more scientifically and economically feasible the alternative was, the more likely that a jury may find that the product was defectively designed. A plaintiff may advance the argument that a safer alternative was feasible with evidence that it was in actual use or was available at the time of

manufacture. Feasibility may also be shown with evidence of the scientific and economic capacity to develop the safer alternative. Thus, evidence of the actual use of, or capacity to use, safer alternatives is relevant insofar as it depicts the available scientific knowledge and the practicalities of applying that knowledge to a product's design."

Appellees contend that the accident occurred in the following manner: Mrs. Nowak stopped her car in the driveway and attempted, but failed, to shift completely into Park; that, after shifting into what she apparently thought was Park, she left the engine running and walked behind the car to close the driveway gate; that as she was closing the gate, the car shifted into reverse, striking and rolling over her, causing her death. Appellees contend that this self-shift occurred because Ford defectively designed and marketed a transmission control system that could be left between the Park and Reverse positions on a flat area referred to as the gatepost.

In this connection, appellees specifically allege that the major defect in the Ford transmission design is in the design and mechanical operation of the part known as the rooster comb. These alleged defects are as follows:

1. The hill between the park and reverse valleys is too flat so that little torque is required to move the plunger from the park valley to the reverse valley.

2. The spring-loaded plunger is too weak which further reduces the amount of torque needed to move the rooster comb.

3. The linkage that operates the parking gear is attached to the rooster comb in a manner that can cause torque to be applied to the rooster comb to move it from park to reverse.

Ford, on the other hand, contends that the design of the system is such that, while it would be possible, it is very unlikely that a driver would mis-position the shift lever between Park and Reverse, so that the parking mechanism was not fully engaged. Ford admits that if the engine was running, the parking mechanism was not fully engaged and the hand parking brake was not properly set, the car might move backwards. Ford further argued that its system conformed to the recommendations of the Society of Automotive Engineers and that a better design was not available. To aid in our discussion of design defect, the drawing below has been reproduced to show the parts of the transmission involved.

FORD FMX INNER MANUAL LEVER

(ROOSTER COMB)

FORD FMX TRANSMISSION PARK MECHANISM

In the present case, in order to review the evidence of design defect under the previously stated guidelines, it is necessary to summarize the testimony of appellees' expert, Mr. Walter Reed, and of the two Ford engineers, Mr. Lee Carr and Mr. Fredrich W. King, III. Throughout the opinion, the word "gatepost," unless otherwise indicated, should be construed to mean the position of the shift lever when it lands on the flat surface between Park and Reverse.

Mr. Reed, appellees' expert, testified that the linkage design used in the Ford transmission system is such that when the driver fails to shift completely into Park and the gear shift lever lands on the gatepost surface, the car will probably self-shift into Reverse.

In describing why this is likely to happen, Mr. Reed explained the linkage system in the FMX transmission in the following manner: The linkage system (as shown above) is designed so that it falls into the Park gear which is the "official park." In order to fall directly into Park, the gears controlling the rear wheels must be in perfect alignment. However, generally, when one comes to a stop, the rear wheels will be in a position which causes the gears not to be in perfect alignment, and what will actu-

ally happen is that the motion of the car will move it somewhat down into this park position. While this is happening, there are three springs in the linkage system which are at work. If the parking pawl does not fall into the parking gear, the spring compresses. The spring is holding the detent plunger and trying to keep the car from going from Park to Reverse. The other spring is compressed at this point and is trying to push the parking pawl into the parking gear, and at the same time, trying to push back the other way and push the rooster comb from Park to Reverse. The third spring is a coil spring. The balance of the forces involved with these springs and the rooster comb is so close that it is inclined to spring back to reverse because of engine vibration. Reed stated that this result was the most undesirable of the three possibilities, i.e., falling into Park, staying on the gatepost, or falling into Reverse. The total system results in a "hair trigger" characteristic susceptible of self-shifting into Reverse.

Reed also testified that it would take 2 or 3 inch/pounds to self-shift a Ford FMX transmission, whereas in a General Motors transmission (hereafter GM), it would take 13 to 14 inch/pounds, and in a Chrysler, it would take approximately 35 inch/pounds. Reed acknowledged that it would be almost impossible to measure the exact amount of torque needed to make the shift from the gatepost to Reverse. However, he did state that, with engine vibration, the external loads of an FMX transmission were of sufficient magnitude to shift the car into Reverse. Generally, slamming the door is a sufficient force in an FMX transmission to cause the car to shift from the position on the gatepost to Reverse. Based on qualitative tests made by Reed, both the Ford and GM systems would shift under vibration, however, the GM system would not shift as readily as Ford. This was so because of the increased torque required for self-shifting. In actual tests, Reed was able to get the Ford vehicle to self-shift from the gatepost to Reverse several times; but he could not get the GM to so self-shift.

Reed testified further that on a Ford vehicle, if the shift control lever is left anywhere on the gatepost, engine vibration or any other disturbance can cause the car to go into Reverse. On a GM, if the lever lands on the gatepost surface towards the Park side, it will fall into Park; if it lands on the gatepost on the Reverse side, it will fall immediately into Reverse. In other words, on a GM transmission, if the shift lever is improperly set on the gatepost, there would not be time to walk around to the back of the car before the car started moving in a Reverse direction. Furthermore, in the GM, if the lever is left on the gatepost, it will probably not move because of the second mechanism for keeping the car in Park. This mechanism is the roostercomb which, in a GM, has a higher point between Park and Reverse than the same type device does in a Ford. Reed was of the opinion that the GM design was superior because it allowed an operator to make an imperfect shift, whereas Ford required that the operator make a complete and perfect shift.

Reed concluded that, in his opinion, the design of the FMX transmission was defective because it did not protect against foreseeable users' operation of leaving the lever on the gatepost which would result in the car shifting itself into Reverse. He also stated that Ford should protect against this occurrence because it is a known operator user pattern.

One of Ford's engineers, Mr. King, testified as follows regarding the design of the FMX transmission: When the entire transmission system was connected, the Ford and GM transmissions were comparable. If one placed the lever in Park, it would stay there; however, if it was not put all the way into Park, it could move either to Park or Reverse because there was nothing to restrain it. Engine vibration or slamming the door could cause it to move either to Park or Reverse. Although it is possible to leave the lever on the gatepost in a Ford, GM, or Chrysler, King contended that the FMX was no more likely to self-shift than GM or Chrysler. King stated that if the lever is on the gatepost in a Ford, it is

neither in Park nor Reverse; however, it would be possible for the car to perform some functions as if it were in Park and at the same time have the transmission begin to pressurize in Reverse, i.e., the car can back up. King contended, however, that there is no way to prevent this. When the lever in the FMX transmission is left on the gatepost, the design is such that both the gravity of the linkage and the design of the roostercomb are trying to shift the car into Reverse. When King tapped the lever on a Ford five or six times, it would drop into Reverse, and the back-up lights would come on.

When questioned on possible design changes, King stated that in order to make the design safer, he would widen and deepen the slot. However, King qualified this by stating that he could not be assured that it would help, but that it might help. Ford did not institute such a design change because it thought that the new design would trick the driver into thinking he was in Park (because of the wider gatepost) when he was really on the flat surface.

Mr. Carr, another Ford engineer, testified to the following: When Ford was compared to GM, and the two transmissions were fully assembled, there was no difference. He stated that, in his opinion, there were things which could be done which would make it less likely that someone would misplace the shift lever; however, there was nothing that he knew of which could totally eliminate the problem.

Carr contended that in the Ford transmission, you "can put a slightly bigger piece on it, slightly more point to the surface than it is now, and that will give you more of a click feel." Carr stated that there is a position along the gatepost where there is still some hydraulic flow through the transmission even though the lever is out of Reverse which could allow the car to back up. Furthermore, if the car is not latched in Park, it could move into Reverse.

Carr agreed that a tentative solution to the problem of shifting from Park to Reverse would be to redesign the product, possibly by redesigning the land between

Park and Reverse so that the selector could never rest between them. Another solution would be to warn the user and develop a program to alert drivers of the danger of leaving any automobile with the engine running.

When questioned as to where the indicator could be and still shift from Park to Reverse, Carr testified that the indicator could be "right over almost to Park." Mr. Carr concluded that if the shift lever is left on the gatepost the car could possibly go into Reverse if it is not latched. Ford knows of no way of preventing this, and, to Carr's knowledge, neither does GM. If the car is properly adjusted with the indicator, the driver can tell that the car is in the Park latch position, and the car will not come out of Park. It is possible to put a transmission system between Park and Reverse. When questioned on what the result of leaving the lever on the gatepost would be if the detent were made deeper and the gatepost higher, Carr testified that there would be no effect.

However, the deposition of another Ford engineer, Mr. Dixon, revealed that the design of the Ford transmission at the time of the accident allowed the lever to be placed on the gatepost between a positive Park position and a positive Reverse. This permitted the possibility of vehicle vibration moving the lever from the gatepost to Park or Reverse.

When considering the overall tenor of the Ford engineers' testimony, even they admit that there is a possibility that the car will self-shift from the gatepost to Reverse. The Ford engineers, unlike Reed, are of the opinion there is no way to improve this system. They are also of the opinion that the Ford FMX transmission is designed similarly to GM and Chrysler. In complete disagreement with Reed, they testified that the risk of self-shifting is the same in Ford, GM and Chrysler.

■ After a review of the above summarized evidence and the entire record and having weighed and balanced all of the evidence, both that in favor of and against

the verdict, we are of the opinion that the findings of the jury in response to the special issues on design defect are supported by evidence of probative force. Thus, we would not be justified in concluding that such findings are so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. Accordingly, we overrule Ford's first and sixth points of error.

Ford contends in points of error two and three that the trial court erred in improperly admitting into evidence a filmed out-of-court experiment and photographs of a gearshift indicator on a test vehicle because appellees did not lay the proper predicate for admission. Ford objected to the admissibility of the film on the basis that similarity of circumstances had not been adequately shown. Appellees responded to the objection by stating that the film was being offered for the limited purpose of showing the design characteristic complained of, i.e., the self-shifting ability of the FMX transmission. The extent of the predicate laid for this purpose was a statement made by counsel for appellees: "We took a Ford automobile and didn't do anything to it, with the linkage properly adjusted and demonstrated the defect that we are alleging in this case."

■ In order to render admissible evidence of an experiment made out of court and without the presence of the opposing party, it is generally required that there be a substantial similarity between the conditions existing at the time of the experiment and those surrounding the event giving rise to the litigation. *Ft. Worth & Denver Ry. Co. v. Williams,* 375 S.W.2d 279, 281–82 (Tex.1964). It need not be shown, however, that the conditions were identical. *Id.* Furthermore, the trial court is permitted broad discretion in determining admissibility, abuse of that discretion being required for reversal. *Keith v. Silver,* 476 S.W.2d 335, 338 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.); *Standard Motor Company v. Blood,* 380 S.W.2d 651, 654 (Tex.Civ.App.—Houston 1964, no writ).

■ After reviewing the predicate laid for the admission of the film, we find that it was not sufficient. Appellees did not sufficiently show that the vehicle in the film had the same characteristics as the Nowak Ford; i.e., an FMX transmission properly adjusted. While the purpose of the film may have been limited, it was still necessary for appellee to show that the vehicle in the film was adjusted similarly to the Nowak vehicle. See: *Kainer v. Walker,* 377 S.W.2d 613 (Tex.1964).

The erroneous admission of evidence will not require a reversal unless the record as a whole affords a substantial basis for the reasonable belief that such evidence may well have caused the rendition of an improper judgment. *Insurance Company of North America v. Asarco, Inc.,* 562 S.W.2d 557 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.).

■ The theory of the design defect presented in the film was also given throughout the trial in the form of interoffice memos, letters from consumers and in the expert testimony outlined in point of error one. We do not find the introduction of this film to be such error which was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. R. 434, T.R.C.P. (1976).

Additionally, when the court allows in evidence, of a nature that is largely repetitious of testimony given by other witnesses, it is harmless. See *Reid v. El Paso Construction Company,* 498 S.W.2d 923 (Tex. 1973). We, therefore, hold that the film was merely cumulative of the other unobjected to evidence in the record, and as such, its introduction into evidence was harmless error. Rule 434, T.R.C.P. (1976); *Ramirez v. Wood,* 577 S.W.2d 278 (Tex.Civ. App.—Corpus Christi 1979, no writ).

Ford's third point of error goes to the admissibility of photographs of the dashboard of the test vehicle taken at the time of the experiment. These photographs were also introduced for the limited purpose of showing the design characteristics of the transmission. Appellant made the same objections to the photographs as were made to

the film. We hold that the admissibility of the photographs was contingent upon the admissibility of the film. Nevertheless, for the same reasons stated in our discussion of the film, we hold that the trial court's erroneous allowance of the photographs into evidence was harmless error. R. 434, T.R. C.P. (1976). Ford's second and third points of error are overruled.

■ In its fourth point of error, Ford asserts that the trial court erred in failing to allow the jury to view the Nowak vehicle. Ford twice requested a jury view. The court did not rule on either request. A motion not acted upon by the trial court furnishes no basis for a point of error. E.g., *Williams v. Williams,* 537 S.W.2d 107, 109 (Tex.Civ.App.—Tyler 1976, no writ); *Ladd v. Knowles,* 505 S.W.2d 662, 668 (Tex. Civ.App.—Amarillo 1974, writ ref'd n.r.e.); *Middleton v. Middleton,* 479 S.W.2d 775, 776 (Tex.Civ.App.—Austin 1972, writ ref'd n.r. e.). Thereby, Ford's fourth point of error is overruled.

Ford's fifth and ninth points of error complain, respectively, of the admission into evidence of subsequent design changes in the transmission and also changes in the Ford owners' manual concerning the operation and use of automatic transmissions incorporated in such manual after the Nowak accident. Ford argues that the admission of design changes and the owners' manual violated the Rule which excludes evidence of subsequent repairs.

"In this jurisdiction, the admission of such evidence [subsequent repairs] is discouraged because it is thought that it discourages repairs. It is also true that such evidence is admissible as rebuttal evidence, to show a defect could be remedied, or to explain other evidence." *Bristol-Myers Co. v. Gonzalez,* 548 S.W.2d 416, 430 (Tex.Civ. App.—Corpus Christi 1977), reversed on other grounds, 561 S.W.2d 801 (Tex.1978). It is appellees' position that the evidence in question was admissible to rebut the testimony of Ford's expert witnesses concerning the feasibility, desirability, and necessity of changes to alleviate the problem.

In response to questioning regarding design changes to reduce the likelihood of the occurrence, Ford's expert, Lee Carr, testified: "I know of no way to do this." However, Mr. Carr went on to qualify that statement when he said: "... There are things that—I think to be done to possibly reduce it. I know of nothing that will eliminate it." Consequently, when the testimony concerning design changes was admitted over objection, it was not rebuttal testimony for it stood only for the proposition that design changes might *reduce* and not *alleviate* the possibility of recurrence.

■ However, as was the case in the above point of error, there was testimony introduced during the trial from other witnesses concerning the design change. This testimony (as more specifically set forth in the discussion of point of error one) was admitted without objection. The rule is that objections to evidence are unavailing when similar evidence to the same effect is offered and received without complaint. E.g., *Mueller v. Central Power & Light Company,* 403 S.W.2d 901 (Tex.Civ.App.—Corpus Christi 1966, no writ); *Bolstad v. Egleson,* 326 S.W.2d 506, 520 (Tex.Civ.App. —Houston 1959, writ ref'd n.r.e.); *Vrazel v. Bieri,* 294 S.W.2d 148, 153 (Tex.Civ.App.—Galveston 1956, writ ref'd n.r.e.); *Lubbock Bus Co. v. Pearson,* 277 S.W.2d 186, 190 (Tex.Civ.App.—Amarillo 1955, writ ref'd n.r.e.). Therefore, no reversible error is shown.

■ With regard to the admission of the changes in the owners' manual, Carr stated categorically that there were no feasible alternatives to the warnings in the 1977 owners' manual. Thus, evidence of subsequent changes in the owners' manual would serve a rebuttal purpose and would be admissible. See *Bristol-Myers Company v. Gonzalez,* 548 S.W.2d 416 (Tex.Civ.App.—Corpus Christi 1977, rev'd on other grounds 561 S.W.2d 801). Ford's fifth and ninth points of error are overruled.

■ Ford, in its seventh point of error, asserts that the trial court erred in granting judgment for appellees because the dangers

posed by failing to complete a shift into Park are within the reasonable contemplation of the general public. Ford appears to be assailing the jury's finding to special issue number six in which the jury concluded that it was reasonably foreseeable by Ford that persons using the Nowak vehicle might not know of the risk of the shift lever being in a position which appeared to be Park, but could self-shift into Reverse because of vehicle vibration. Ford asserts that there was *no duty* (emphasis theirs) to provide a warning of the risk at issue. They rely on the language in the Restatement of *Torts,* § 402(A) which provides in pertinent part:

"Comment (j), a manufacturer has no duty to warn of dangers which are within the reasonable contemplation and knowledge of consumers."

Using this reasoning, Ford states that every member of the general public who has driven a column-mounted gearshift is familiar with the "feel" when a shift lever is properly engaged in the park notch. Ford argues that the public is aware that if the shift is stopped before the Park notch is reached, the vehicle may not be fully or properly shifted.

We hold that Ford has waived any right to seek judgment based on this contention. Rule 279, T.R.C.P. Ford did not move for judgment on this issue or request the trial court to submit a special issue on this matter. Further, it did not object to the failure of the charge to include such an issue. Even if this point of error was properly before the Court, we find that the jury could adduce from the evidence presented that the risk involved here, i.e., leaving the shift lever in a position which appeared to be the proper position when in fact it could self-shift into reverse, was not within the reasonable contemplation of the general public.

Coinciding with point of error seven, Ford contends in its eighth point of error that the trial court erred in granting judgment for appellees because the jury finding that Ford failed to adequately warn the users of the Nowak Ford of the danger of

the car self-shifting was against the great weight and preponderance of the evidence. Ford contends that the duty to warn was adequately discharged by two portions of its owners' manual. Accordingly, Ford contends that if these instructions had been followed by Mrs. Nowak, the accident could have been avoided.

It is well established that the adequacy of a warning presents a fact question for the jury's determination. *Lopez v. Aro Corporation,* 584 S.W.2d 333 (Tex.Civ. App.—San Antonio 1979, writ ref'd n.r.e.); *Bituminous Casualty Corp. v. Black & Decker Manufacturing Co.,* 518 S.W.2d 868 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r. e.), and cases cited therein. The essential factors of a legally adequate warning have been summarized as follows:

"(1) it must be in such form that it could reasonably be expected to catch the attention of the reasonably prudent man in the circumstances of its use; (2) the content of the warning must be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person." *Lopez v. Aro Corp., supra,* at 335.

The warnings which Ford argues are adequate are as follows:

"CAUTION—When leaving your car, always shift into P (PARK) and set the parking brake."

P (PARK)—This position locks the rear wheels and the transmission whether or not the engine is running. Always come to a full stop before shifting into P (PARK). Remember that the gear shift selector must be in this position before you can remove the ignition lock cylinder key. Do not use the P (PARK) position in place of the parking brake. Always set your parking brake and shift into P (PARK) when you leave your car.

When these warnings are reviewed by the standard set out above, it is apparent that there was ample evidence to support the jury finding. We hold that the jury was justified in finding that these warnings

are not in such a form that they could be reasonably expected to catch the attention of a reasonably prudent person, nor did they convey to the user a fair indication of the nature and extent of the danger. After considering the weighing all of the evidence in the record, we hold that the jury answer that Ford failed to provide an adequate warning is not against the great weight and preponderance of the evidence. *In re King's Estate,* supra; *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965).

In point of error ten, Ford claims that the trial court erred in granting judgment for appellees because the jury answer of $400,000.00 to special issue eight, which inquired as to pecuniary loss suffered by appellees, was against the great weight and preponderance of the evidence. In considering an against the great weight and preponderance of the evidence point, we are required to review all of the evidence in the record. *In re King's Estate,* supra; Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, supra. In the present case, the record shows how much Mrs. Nowak's salary was, her fringe benefits and her retirement. There was also evidence in the record of how much time and effort she expended on running the ranch and household chores. The evidence also shows that Mr. Nowak was in bad health and needed Mrs. Nowak's nursing care. The economist calculated pre-trial lost earnings and fringe benefits and pre-trial loss of service. Future earnings and loss were computed in several different ways. After carefully reviewing all of the evidence in the record, we hold that the jury's finding of $400,000 in actual damages is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

Ford's points of error eleven, twelve and thirteen relate to the issue of whether or not punitive damages were appropriate in this case.[1] In order to support an award of punitive damages, gross negligence is required. This type of gross negligence has been defined as that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it. *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981); *Missouri Pacific Ry. v. Shuford,* 72 Tex. 165, 10 S.W. 408 (1888). What lifts ordinary negligence into gross negligence is the mental attitude of the defendant; that is what justifies the penal nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare and safety. Such conduct could be active or passive in nature. Furthermore, the existence of gross negligence need not rest upon a single act or omission, but may result from a combination of negligent acts or omissions. Many circumstances and elements may be considered in determining whether the act constitutes gross negligence. A mental state may be inferred from actions or inaction. In determining whether evidence of the jury findings of gross negligence is against the great weight and preponderance of the evidence, the reviewing court must look to all surrounding facts, circumstances and conditions, not just to individual elements or acts. *Burk Royalty Co. v. Walls,* supra; *Rawlings Sporting Goods Company, Inc. v. Daniels,* 619 S.W.2d 435 (Tex.Civ.App.—Waco 1981, writ ref'd n.r. e.).

In the instant case, the pertinent evidence is as follows: Between 1971 and 1977, Ford received numerous complaints from several people regarding the problem of the FMX transmission self-shifting from Park to Reverse if the vehicle was not properly shifted into Park, i.e., left on the gatepost.

Of the accident reports received by Ford between 1971 and 1977 on automatic transmission passenger cars, 234 accidents appeared to have been caused by an unattend-

1. Appellees were awarded $4,000,000.00 in punitive damages. Ford, however, is not contending that this amount is excessive or seeking a remittitur. Instead, they are only contending that any punitive damages were inappropriate.

ed car backing up. Out of those 234 cases, 89 of them resulted in some type of injury to the operator, pedestrians or someone outside the car. There were 728 accidents between 1971 and 1977 that were attributed to the failure of the transmission. Ford did not compile records of similar complaints on trucks with automatic transmissions or standard-shift vehicles.

There were interoffice memos and letters introduced into evidence which showed that Ford was aware of this problem beginning in 1971.

A letter from Mrs. Applegarth, dated June 9, 1971, which Mr. Dixon later refers to in a memo reads as follows:

"Dear Sir:

I am just recovering from an experience in which I do not believe I was entirely responsible. If there is some engineering flaw which is correctible, I am sure you would want to correct it.

We own a 1970 Mercury, purchased December 18th, with approximately 3,500 miles on it.

I drove it down the driveway last Thursday, wanted to get out at the street, put the car in park and proceeded to get out. The next thing I knew I was thrown to the ground. Fortunately, I did have the presence of mind to roll or I would have been run over. The car proceeded back up our driveway for about 150 feet when and where veered and ran into a tree that stopped it. My husband was home, saw part of the accident, his reaction was to run to the car, door still open 'the darn thing is in park.' Obviously, the engine was in reverse, but the lever was in park. There must be too small a margin for that position.

I have driven many thousands of miles and this is the first lapse. I am so glad

no child was behind or near and could have been killed.

I am certain that if this can be corrected, you will do it.

Sincerely,
Mrs. Leo Applegarth"

An interoffice memo, written as early as December 8, 1971, by D. R. Dixon, Principal Engineer, Chassis Safety Engineering Department of Ford, reads as follows:

"Mr. Cannon: Subject: Shift lever and transmission engagement park to reverse. The purpose of this letter is to alert you to the increasing number of customer complaint letters pertaining to the transmission control operation and recommend consideration of a design revision. The primary mode of an alleged performance problem occurs when the customer leaves the vehicle with the engine running, thinking he has moved shift lever into 'park' position, and the transmission subsequently engages in reverse. We are now receiving approximately six letters per month of this type.

The attached customer letter from Mrs. Leo Applegarth is typical of those received. The conclusion that the 'reverse' to 'park' detent travel is marginal deserves consideration as the 1972 Cadillac shift travel from 'park' to 'reverse' is noticeably greater than that noted on Ford vehicles.

It is requested that any design, tooling and cost implications of an increased travel for 'reverse' to 'park' detent be established jointly with the Transmission Division for possible incorporation in forward designs."

Mr. Bryant, Ford's manager responsible for the design of the steering column, responded to the above memo on January 13, 1972.[2]

2. It reads as follows:

"Subject: Shift lever and transmission engagement-park to reverse.
Reference: Mr. D. R. Dixon's communication of 12-8-71, same subject.
The purpose of this communication is to inform you of the action being taken on the subject problem. Our investigation of service complaints and complaint vehicles

shows that this problem is a result of the customer not placing the shift lever in the detent plate slot, for the park position. _When the shift lever is not placed in the slot, engine vibration can cause the lever to fall back into reverse position and result in the car moving rearward._ (underscoring ours)

The basic linkage design is such that we have linkage stretch to insure we always pull the

In spite of the urging of Mr. Dixon and the recommendations of Mr. Bryant, Ford did nothing to affirmatively alleviate the dangerous condition which was called to their attention. In fact, it appears that it even rejected the problem sheet of the Chassis Safety Engineering Department and ignored Mr. Dixon's recommendation that rejection of such problem be appealed to a higher management level.[3]

In addition, there were several letters to Ford from Eastern Airlines introduced into evidence for the limited purpose of showing that Ford had notice of claims by customers and not for the truth of the matters asserted therein. Eastern letter of May 14, 1973 follows:

"Dear Tom: This will confirm our conversation on the two safety items Eastern has found on trucks, the engine mount breaking and the automatic transmission control selector or position insert failing. Tom, we have had left mounts break. We have had men injured while the truck suddenly starts moving in reverse. Delta has had this same problem and I understand has advised Ford, as well as Eastern having advised your representative in the Miami area. Let us know what corrective action Ford will take on this problem as soon as possible."

Obviously nothing was done by Ford because on March 11, 1974, Eastern wrote another letter complaining of the same problems and ending with the following request:

"It appears that it has been only by the grace of God that to date that we have not had a serious injury or fatality. Ford apparently has taken little or no interest in resolving this problem. We now feel that we need immediate and effective action. Therefore, we are requesting that this matter be handled at whatever level is necessary to get Ford's prompt and serious attention to resolving the matter before a serious incident does occur."

There was also introduced into evidence a reliability study, made in 1972, for the 1976 models wherein it was proposed that the column detent plate between Park and Reverse be redesigned to ensure that the transmission would not jump out of Park when customers did not fully engage the Park slot in the detent plate. It was estimated that these revisions would help correct the problem in question in 95% of the cases at a cost of $.03 per car. In this report, Mr. Bryant stated that one car out of every 1,000 with the present design was likely to need repairs, whereas, with the recommended design change, the likelihood

---

transmission fully into the park detent prior to reaching the slot in the detent plate. To eliminate the condition where the customer does not fully reach the slot in the detent plate, we are investigating two alternate designs. One design which can be incorporated without transmission change is to angle the detent plate between reverse and park and also angle the tang of the shift lever. This will result in the shift lever always having to climb uphill to slip back into reverse when not fully engaged in the park slot. In addition, the two angular services [sic] will automatically hold whereas present flat surfaces can slip due to the engine vibration.

The second approach which would require a transmission revision increases the angular travel between reverse and park. This will give us a larger land to work with and permit us to incorporate a double step on the detent plate to catch the lever if it should not be placed in the slot by the customer.

We plan to have the first proposal formulated [sic] into a study package for the study

committee by 2 1 72. Based on cost and vehicle tryout, we will determine if the first proposal is satisfactory. If this is satisfactory, the second proposal will not be pursued past the tryout steps."

3. "Subject: Product Problem Safety Review Committee Meeting Number 125.

The agenda and potential problem lists handout from the subject meeting is attached for your information.

Mr. H. Fereshetian reported on the trip to Buffalo where he examined a 1970 Mercury alleged to jump from park to reverse. In addition, chassis has issued a problem sheet to correct a poor condition of pointer alignment to 'park' nomenclature between detents on some vehicles.

Mr. Fereshetian reported the problem sheet was rejected by customer vehicle development group. The committee feels strongly that this rejection be appealed to a higher management level." (underscoring ours)

for repairs would decrease to one in every 10,000.

When questioned about what was done between 1971 and 1977 to prevent drivers from leaving the lever on the flat surface, Mr. King testified that the Lincoln-Mercury owners' manual was redone in 1971, and that the "ARK" was taken off "Park." The owners' manual was changed one month before Mrs. Nowak was killed (December 1976) to include the "Caution" before the instructions: "In shifting into the Park position, make sure that the shift lever has been pushed as far as it will go in a counterclockwise direction and cannot be moved without lift."

The above testimony is the only testimony which shows that Ford took any affirmative action to attempt to rectify the dangerous condition of the parking mechanism. Even this was not a correction of the design defect, but was an instruction to the owners of Ford automobiles. After reviewing all of the evidence, it is apparent that Ford knew of the dangerous condition but failed to correct it when it was economically and technologically able to do so. This apparently willful disregard of the consumers of such defect over such a lengthy period of time was best illustrated by the testimony of Mr. Thomas Shaw, a Ford engineer, who testified by deposition as follows:

"Q: Tell me about this change that you are going to make in the '80 models.

A: Okay. One of the changes that the Company is thinking of making in the 1980 models is a revision to the insert, the gate. They are going to deepen the latch area of the insert and they are going to raise the flat or gate-post area of the insert.

    \*    \*    \*    \*    \*    \*

Q: Is that a technological innovation that was not available to Ford in 1971?

A: No. That would be technically available to Ford in 1971.

Q: Does the design you just described cost any more?

A: I can't see that it would. I would say, no, that it doesn't cost any more."

When Mr. Shaw was questioned on why the change in 1980 models was not incorporated in 1972, he replied, "because I did not have the job then. I am the guy that thought of it. I am the guy that recommended it be done, and I am the person that made sure it was done."

In spite of Mr. Shaw's believing that he was the person who thought of the design change, actually such type of change had been brought to the attention of Ford prior to his recommendation. However, Mr. Shaw was the "Man who made sure it was done."

After a careful review of the above evidence and all of the other evidence in the record, we are of the opinion that the evidence of gross negligence is not so against the great weight and preponderance of the evidence as to justify a new trial. *Burnett v. Motyka,* 610 S.W.2d 735 (Tex.1980); Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 359 (1960). Ford has not brought a point of error on remittitur. Accordingly, Ford's eleventh, twelfth and thirteenth points of error are overruled.

Ford contends in point of error fourteen that the trial court erred in allowing appellees' counsel to engage in improper jury argument which was based on matters wholly outside the record and by which appellees' attorney attempted to prejudice the jury against appellant.

In order for Ford to be successful in its complaint that appellees' jury argument was improper and therefore reversible, it has the burden of proving (1) an error, (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for a mistrial, (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge, and (5) that the argument, by its nature, degree and extent, constituted reversibly harmful error. *Standard Fire In-*

surance Company v. Reese, 584 S.W.2d 835 (Tex.1979); *Armellini Express Lines of Florida, Inc. v. Ansley,* 605 S.W.2d 297 (Tex. Civ.App.—Corpus Christi 1980, writ ref'd n. r. e.); 3 McDonald, Texas Civil Practice § 13.17.2 (1970). There are only rare instances of incurable harm from improper argument. Reversal will only be required after an evaluation of the entire record, though leaving appellant with the burden of showing that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. *Standard Fire Insurance Company v. Reese,* supra; *McVicker v. Johnson County,* 616 S.W.2d 430 (Tex.Civ.App.— Waco 1981, writ ref'd n. r. e.).

In the present case, there were no objections by Ford to the jury arguments of appellees' counsel. Accordingly, we hold that Ford, by failing to object and press for an instruction at the time of the argument, waived its complaint. *Standard Fire Insurance Company v. Reese,* supra. See also: Dahlberg, *Analysis of Cumulative Error in the Harmless Error Doctrine: A Case Study,* 12 Tex.Tech.L.Rev. 561 (1981). Furthermore, after a careful review of closing arguments and the entire record as required, we are of the opinion that the arguments were either invited or were a proper comment on the evidence or, if objectionable, Ford failed to object and failed to show that such arguments were calculated to cause or probably did cause the rendition of an improper verdict. Rule 434, T.R.C.P.; *Central Power & Light Company v. Wedig,* 485 S.W.2d 802 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n. r. e.). Ford's fourteenth point of error is overruled.

In its fifteenth point of error, Ford contends that the trial court erred in not dismissing Juror Quinney. During the course of the trial, Juror Quinney reported to the trial judge that he had been arrested over the weekend and charged with felony driving while intoxicated. Mr. Quinney spoke with the trial judge about the charge stating "... that it [the felony DWI] was apparently a mistake, because he had never before been convicted of even a misdemeanor driving while intoxicated." The trial court checked the record and determined that while Mr. Quinney had on a prior occasion been charged with driving while intoxicated, the charge was dropped and he was instead convicted of a traffic offense. The court then stated, outside the presence of Juror Quinney:

"So far as the records reveal he has no record of a D. W. I. conviction and I would like to ask Mr. Salyer [appellees' attorney], who is an attorney in this case and also the District Attorney, if he has any plans at all to seek an indictment against Mr. Quinney for a felony anything.

MR. SALYER: No, sir.

MR. SLUSSER [Ford's attorney]: Judge, the only problem that I can perceive remaining is what might be in the mind of Mr. Quinney. He may feel Mr. Salyer has some control over his destiny and for that reason would be beholden to Mr. Salyer and we, therefore, have a risk that whether it is correct or not, he would be influenced in his decision in this case because of Mr. Salyer's presence.

THE COURT: I am glad you brought that out and let me say this. Mr. Quinney told me earlier this morning that he went over to see Mr. Tommy Uher, who is an attorney here in Bay City, who is his attorney. Mr. Uher told him after hearing the facts from his client that he had nothing to worry about. Mr. Quinney told him he should discuss this with me and Mr. Uher said you have nothing to discuss because it is not a felony, so I told Mr. Quinney exactly the same thing. So I know in his mind he wouldn't fear any felony prosecution, so I believe we are in good shape.

If I had any doubt about it at all I would excuse him, but I don't really think it is necessary."

Ford then requested that the trial court either excuse Mr. Quinney or declare a mistrial. The trial court refused to do either. Thus, Ford contends that the trial court's inaction was reversible error.

In support of this contention, Ford cites several cases in which the courts reasoned that the right of trial by jury must remain inviolate, and therefore a motion for new trial is appropriate where one of the parties to a lawsuit or its counsel did a favor for one or more of the jurors hearing the lawsuit. Ford argues that in the present case, the "favor" of non-prosecution justified a new trial.

It is important to note in this case that juror Quinney did not receive any favor from appellees' counsel. Mr. Quinney told the trial court himself that the present felony DWI charge could not be correct because he had never been convicted of a misdemeanor DWI. The court's conversation with Mr. Salyer inquiring into whether or not he planned to prosecute Mr. Quinney took place outside the presence of the jury, but most importantly, outside the presence of Mr. Quinney. Juror Quinney's own personal attorney advised the juror that he had nothing to worry about. We, therefore, find that this present case is clearly distinguishable from the cases cited by Ford because there has been no favor asked for or granted. The cases in which a new trial has been granted are replete with evidence of an actual favor being given. In those cases, it was correctly presumed that harm occurred. See: *Texas Employers' Insurance Association v. Brooks,* 414 S.W.2d 945 (Tex.Civ.App.—Beaumont 1967, no writ); *Texas Milk Products Co. v. Birtcher,* 138 Tex. 178, 157 S.W.2d 633 (1941).

We hold that a favor was not granted to Juror Quinney, and there has been no prejudice as a matter of law. Ford's fifteenth point of error is overruled.

■ Ford contends in its last point of error that the trial court erred in allowing appellee to be represented by more than two counsel in violation of Rule 9, T.R.C.P. Rule 9 reads as follows:

"Not more than 2 counsel on each side shall be heard on any question or on the trial, except in important cases, and on special leave of the court."

Ford did not raise this objection in the trial court until approximately half-way through the trial. The general policy underlying the rules of civil procedure is that for most procedural errors to be corrected on appeal, the complaining party must make his objection in the trial court, when practicable and at a time when the trial judge can correct the error without substantial interference with the judicial process. *Jones v. McSpedden,* 560 S.W.2d 177 (Tex.Civ.App.—Dallas 1978, no writ). Accordingly, we hold the proper time for Ford to object was at the beginning of the trial and not when the trial was halfway finished. Point of error sixteen is overruled.

The judgment of the trial court is affirmed.

GONZALEZ, Justice, dissenting.

I respectfully dissent. Considering the record as a whole, the erroneously admitted film and photograph, and appellees' jury argument were reasonably calculated to cause and probably did cause the rendition of an improper judgment. Also, there is no evidence to support the finding of gross negligence.

This was a hard fought products liability suit. It arose out of an accident that occurred on January 21, 1977, when the body of Ann Nowak was found underneath her 1977 Ford automobile. There were no eyewitnesses. The accident apparently occurred when Mrs. Nowak stopped the car in her driveway and either attempted to shift the transmission into park, or she intentionally left the shift between the park and reverse positions with its engine running. The car apparently self shifted into reverse and ran over her, causing her death. The owner's manual cautions drivers to place the vehicle in park *and* set the emergency brake. Had she followed these instructions the accident would not have occurred. Therefore, in my opinion, the question of Ford's liability is close.

## FILM AND PHOTOGRAPH

Over appellants' objection, the court permitted the jury to see a filmed out-of-court experiment. As a general rule, evidence of

an out-of-court experiment, conducted without the presence of the opposing party, is admissible *only if* the conditions existing at the time of the experiment are substantially the same as those surrounding the event giving rise to the litigation. *Fort Worth and Denver Ry. Co. v. Williams,* 375 S.W.2d 279, 281–82 (Tex.1964).

Appellees contend that the film was not offered as evidence of how the accident occurred. Rather, it was offered to show "the design characteristics of the Ford transmission."

The film depicted an unidentified Ford at the scene of the accident performing the same movements which, according to the appellees' theory, caused Mrs. Nowak's death. The car was driven to the Nowak gate and brought to a halt. The driver, who was one of the police officers who investigated the incident, testified that after he brought the vehicle to a stop, he shifted the transmission so that the gear shift indicator was pointing to "P." The film then showed five instances where the vehicle would remain stationary for a few seconds before moving backwards toward the Nowak's gate.

The photograph in question was admitted into evidence to show the location of the gear shift indicator during the filmed instances of unexpected vehicle movement. The photograph appeared to show the shift indicator clearly pointing to "P."

Though appellees stated that they were not offering the film as evidence of how the accident occurred, their jury argument was to the contrary. This is what their attorney said about the film:

> "You see that's the purpose of the movie. We have tried this case so long that we have forgotten. That is the purpose of the movie. I think the evidence will show you that I was there. The purpose of that movie was to show that it could not happen any other way. This car has to go into whatever you want to call it, false park, and stay there to be able to give her time to get out of the car and walk around and pick that gate up and move it back around in this position and

the car comes over here. She has got to have time to make that movement and then it shifts gears and it comes over and drags her body and mangles it in that accident . . . ."

The film was a dramatic and effective piece of evidence to illustrate appellees' theory of how the accident occurred. However, it was error to admit it and the photograph because the proper predicate of similarity of conditions between the experimental vehicle and the Nowak vehicle were not proven. This error was compounded by the jury argument.

The proper predicate for admitting the film and photo would have been evidence that the condition and adjustment of the transmission in the experimental vehicle was substantially similar to the transmission in the Nowak vehicle. Appellees' evidence of substantially similar conditions was nonexistent. Therefore, the court abused its discretion in admitting both the film and the photograph. The introduction of the film and the photograph was such an error which was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Tex.R. Civ.P. (1976).

## JURY ARGUMENT

The majority recognizes that there are rare instances of incurable harm from improper jury argument. This Court, in *Hartford Accident and Indemnity Co. v. Thurmond,* 527 S.W.2d 180, 193 (Tex.Civ.App.— Corpus Christi 1975, writ ref'd n. r. e.), explained the distinction between curable and incurable jury arguments as follows:

> "Improper jury arguments are usually referred to as one of two types 'curable' or 'incurable.' A jury argument is curable when the harmful effect of the argument can be eliminated by a trial judge's instruction to the jury to disregard what they have just heard. The error is cured and rendered harmless by the instruction. On the other hand, an argument may be so inflammatory that its harmfulness could not be eliminated by an objection or

an instruction to the jury to disregard it. The prejudicial nature of the argument is so acute that it is incurable."

Therefore, if an improper jury argument is so prejudicial that its harmful effect on the jury cannot be cured by an instruction to disregard it, the argument is incurable and no objection is necessary to preserve the error.

The jury argument made by the District Attorney, who was employed as local counsel for appellees, is as follows:

" . . . You see the Frank Nowaks of this world and I live with these people and I know them and if I use terms that may offend some of you it is because I use them with love and they, I hope, love me back. Czechs, Bohemians, I can do it, oil field trash, oil field people, but since I am with them I use those terms they know that I do not mean anything offensive towards them, but Frank is a little man sitting out there on Allenhurst Road. You heard his deposition. He certainly is not any college professor and he certainly is not able to take on the people of Ford. You talk about David and Goliath, Frank Nowak has no chance against Ford Motor Company. His resources, mental ability and everything else is just like a midget or a flea climbing up an elephant . . ."

In discussing the difference between burden of proof in a civil case and in a criminal case, the appellees' attorney went on to state:

" . . . He didn't tell you that they [Ford] had hired a million dollar Watergate lawyer to represent them against a country prosecutor like me and he didn't tell you that they had to prove that beyond a reasonable doubt.

In this case, and in the Court's charge Frank Nowak has to prove his case to you by a preponderance of the evidence, 51% or the greater weight of the believable evidence that you have heard. They tried to mislead you there and then they attacked the first little guy on the stand, Bob Taylor. They attacked Nubbins Chambless, the guy that went out and made the movie. They attacked, of course, Dr. Reed, then yesterday I thought was the crowning blow was Scott King. That was reprehensible and shows the arrogance, the complete condescending attitude that Ford has towards you, towards this Court, towards us and towards Frank Nowak.

They start being condescending to you in saying, you may not be able to understand, we're going to try to make it as simple so you poor people can understand, and it has been that way throughout this trial.

We are the great Ford Motor Company. We're going to send these lawyers down here from Houston and fool those folks down there in the country . . ."

Regarding Ford's engineers, he said:

"The work that Cannon did as opposes to this little engineer over here, with his tailor made suit and his Italian shoes, . . .

\*     \*     \*     \*     \*     \*

. . . Then they jump on little Scott King [plaintiff's witness], well, I have known him as long as I have known some of you people, they jump on him, and they come out with some ridiculous story, if that doesn't destroy him and if you believe anything that Carr [Ford's expert witness] says after those two instances, then you believe in the tooth fairy, . . .

If you pull musical strings, Carr will dance to any tune that Ford sings, he is completely their man. . . ."

In discussing punitive damages with the jury, the attorney said:

" . . . Ladies and Gentlemen, in this area it is hard because we are dealing with such a large sum of money to you and I, it is peanuts to Ford."

As correctly noted by the majority, the function of the jury was to impartially balance the product's utility against the likelihood of and the gravity of injury from its use. With the district attorney of a small county fanning the fires of regional prejudice and passion against "big bad" corporation with Watergate lawyers and engineers wearing tailor made suits and Italian shoes, the jury was incapable, as a matter of law, to properly carry its function.

The masterful jury argument also contained continuous references to matters outside the record and vouched for the credibility of the appellees' witnesses, and, therefore, in my opinion, was improper. Since I believe that the issue of Ford's liability was close, I find it ludicrous to say that this argument did not have an effect on the jury's verdict.

I do not expect perfect trials. This is why we have the harmless error rule. I also believe that some appeals to a juror's bias and prejudice are inevitable and a necessary part of our adversary system of justice. I am also aware that cases have rarely been reversed because of unobjected to jury arguments. However, in the context of this case, the argument as a whole was improper and could not have been cured by an instruction. It was so prejudicial that it was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Tex.R.Civ.P. (1976).

## GROSS NEGLIGENCE

The jury found that Ford's design of the transmission control system constituted gross negligence. They therefore assessed punitive damages in the amount of Four Million Dollars against Ford. The Supreme Court has defined gross negligence as follows:

"Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be effected by it." *Missouri Pacific Ry. Co. v. Shuford,* 72 Tex. 165, 10 S.W. 408 (1898).

This definition has been recently reaffirmed by the Supreme Court in *Burk Royalty Company v. Walls,* 616 S.W.2d 911, 920 (Tex.1981), where the court held:

"The essence of gross negligence is not the neglect which must, of course, exist. What lifts ordinary negligence into gross negligence is the mental attitude of the defendant; that is what justifies the pe-

nal nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." *Burk Royalty Company v. Walls,* supra, 922.

The court further held:

"In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look to *all* of the surrounding facts, circumstances, and conditions, not just individual elements or facts.... A mental state may be inferred from actions. *All* actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is some evidence of gross negligence." (emphasis added.)

The majority in this case is of the opinion that (1) Ford knew about this "problem"; (2) that Ford recommended a feasible design change which would solve the "problem"; and (3) that Ford nevertheless took no corrective action. There is, however, no evidence in the record to support these conclusions.

In 1971 and 1972, Ford Motor Company knew that the FMX gear selector lever could be mispositioned, and that it could, under some circumstances, move into reverse. This lawsuit, however, was based upon another "problem."

The "problem" in Ford vehicles, according to appellee, was that they have a *"unique* hair trigger design" and are thus *unusually* susceptible to moving into reverse because of the "balance of forces" in the transmission, *or* that they are uniquely likely to mislead the user. It is these allegedly unique characteristics of the Ford design which, according to appellee, render it defective. There is, however, not one scintilla of evidence that any Ford engineer, knew or believed that Ford vehicles were *unusually* susceptible to vibrating into reverse, attributed the complaints received to

the "balance of forces" in the transmission, or believed that the Ford design was particularly likely to mislead users.

The complaints, documents and incidents relied upon by the appellee to establish that Ford "knew" of "the problem" establish only that Ford knew that its vehicles were subject to the same general risk of mispositioning which is inherent in *all* column mounted shift selector designs (including G. M. & Chrysler). There is no evidence that any Ford engineer was ever consciously aware of the characteristics which appellee contends are unique or unusual.

Although the majority points out that over a six year period there were 728 accidents attributed to the transmission, when this number is put in the proper perspective and considered along with the number of automobiles Ford sold per year and the incalculable number of shifts per year, it becomes insignificant.

The record disclosed that a correspondence between Eastern Airlines and Ford was admitted into evidence with the instruction that it not be considered for the truth of the matters alleged therein. Though paying lip service to this limitation, the majority uses this correspondence as proof that 1) there was a defect; 2) Ford was aware of it; and 3) Ford did nothing about it. Other evidence in the record discloses that the difficulties experienced by Eastern Airlines were the result of neither the general risk inherent in the design nor the unique risk alleged by appellee to exist in the Ford design. Rather, Eastern was experiencing problems with broken and worn parts, or with parts modified by the post-sale builder of Eastern's specialty vehicles.

The first letter from Eastern, which was dated May 14, 1973, refers to a vibration from the park to reverse position when the transmission control selector "fails or wears." A letter dated March 29, 1974, indicates that the "broken or worn parts" were given to a Ford engineer in Miami. A memorandum dated March 11, 1974, indicates that the incidents were due to "the left motor mounts breaking." A letter dated July 26, 1974, concerned Ford's investigation of Eastern's complaints. It concluded:

"Misadjusted chassis linkage plus steering column relocation by vehicle supplier: Bullard Aircraft Equipment Co.; Miami, Florida prevents sufficient angular travel of transmission outer manual lever to properly engage parking pawl and parking gear in transmission."

The record further discloses that no Ford engineer ever suggested any change that was intended to alter the balance of forces in the transmission or the appearance of the indicator. The 1980 changes referred to by the majority were not designed to change the balance of forces in the transmission or to affect the indicator. Rather, they were designed to enhance the "feel" of a shift into park.

A review of the record as a whole leads me to the conclusion that there is no evidence from which the jury could find that the utility of the transmission was outweighed by the likelihood of and the gravity of injury from its use. Further, there is no evidence that Ford was consciously indifferent to appellees' rights, welfare and safety, so as to justify the award of punitive damages.

For these reasons, I would reverse and remand the judgment of the trial court on the issue of compensatory damages and render a take nothing judgment on the issue of punitive damages.