Ray RUIZ et al., Appellants,

v.

FLEXONICS et al., Appellees.

No. 902.

Court of Civil Appeals of Texas, Corpus Christi.

Dec. 31, 1974.

Rehearing Denied Jan. 23, 1975.

Steve Q. McManus, Kilgore, Cole & Seerden, Victoria, for appellants.

O. F. Jones, Victoria, for appellees.

## OPINION

NYE, Chief Justice.

This is a products liability case. The plaintiffs brought suit against the defendant, Flexonics, a division of Universal Oil Products Company, alleging damages caused by fire to their home, personal injuries to Maria Ruiz, and damages for the death of Yolanda Menchaca due to the dangerous and defective rubber hose manufactured by the defendant and used on a space heater in plaintiffs' home. The plaintiffs alleged that the heater hose was not suited for its intended use and the defendant failed to warn the plaintiffs of its inherent dangers which caused the damages and injuries complained of.

The case was tried before a jury which answered special issues from a preponderance of the evidence that: 1) the defendant manufactured the hose in question intending that it be used on a space heater; 2) the defendant's manufacturing of the hose in question with the rubber connector rendered said hose unfit for use on a space heater; 3) it was reasonably foreseeable by the defendant, by and through its principal agent, that users of the hose in question might attempt to use it to connect a space heater to the source of fuel; (4 and 5 not applicable); 6) defendant failed to give adequate warning of the danger in using the hose in question in connecting a space heater to the source of fuel; and 7) the defendant's failure to give an adequate warning of the danger of using the hose in question to connect a space heater to its source of fuel exposed the user to an unreasonable risk of harm. (The court properly defined "unreasonable risk of harm".) [1]

In the next three (3) special issues, the jury was asked to find from a preponderance of the evidence that the use of the hose in question with a space heater was *a producing cause* of: (8) damages to the house and its contents; (9) injuries and damages sustained by Maria Ruiz; and (10) the death, injuries and damages of Yolanda Menchaca. The jury answered "We do not" to the last three issues. Based on these answers, the court entered judgment for the defendant from which the plaintiffs have appealed.

1. By the term "unreasonable risk of harm" as used in the above and foregoing Special Issue, is meant that the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary user who purchases it, with the ordinary knowledge common to the community as to its characteristics.

The plaintiffs were Ray Ruiz and wife, Maria, individually and as administratrix of the estate of Yolanda Menchaca, Ernest Menchaca and his wife, Otelia Menchaca. Ray and Maria Ruiz purchased their home in 1967 and lived there until the house was destroyed by the fire on November 28, 1971. Sometime in October of 1971, the Ruiz' employed a plumber by the name of Guadalupe C. Martinez, who removed and reinstalled a gas line that supplied gas to the front two bedrooms on the west side of the house. After he finished the work on the gas line, Mrs. Ruiz asked Martinez to hook up the gas line to a space heater she had by using a new hose which had been manufactured by the defendant and which she had recently purchased. Martinez connected the gas pipe to the space heater using the new heater hose. He tested it, and finding nothing wrong, turned off the gas jet at the wall in the bedroom and left the premises. The fire and explosion took place some three or four weeks later.

The heater had not been used prior to the evening of the 28th and this was to be the first time it was to be used with the heater hose. The heater was located approximately one foot from the south wall of the bedroom and approximately two to three feet from the gas jet on the west wall of the bedroom. Somewhere behind the heater in question (the exact distance not known) was an open closet (without doors). Mrs. Ruiz lit the space heater around 9:00 o'clock p. m. Her daughter, Otelia Menchaca, and her two children, Yolanda and Ernest, were moving in with the Ruiz' as Otelia had just given birth to Ernest and needed some help from her mother· until she recovered her health. Mrs. Ruiz went back after lighting the stove to help Otelia unpack her things. At about 11:00 o'clock p. m., Otelia noticed a fire near the connector to the heater. After an unsuccessful attempt to put out the fire, Maria thereupon took her son, Ray, outside, then she went back in picked up Yolanda and Ernest, and took them out of the house. After she had gotten completely out of the house with all three children, for some unexplained reason, she re-entered the house with her two grandchildren, Yolanda and Ernest, at which time there was an explosion, knocking Otelia outside the house, but leaving Maria and the two grandchildren, Yolanda and Ernest, in the house. Maria was able to get Ernest out but was unable to rescue Yolanda. Yolanda was finally rescued but died approximately four hours later due to severe burns. Maria received severe burns requiring hospitalization for eighteen (18) days.

Appellants' first point of error was that the trial court erred in not granting the plaintiffs' motion for mistrial in that there was an irreconcilable conflict between the jury's answers to special issues numbered 8, 9 and 10 and the jury's answers to the damage issues numbered 11, 12, 13, 14 and 15; and that the court erred in rendering and basing a judgment on the jury's answers to said special issues.

The plaintiffs argue that each of the damage issues have causation built into them and they, therefore, conflict with the producing cause issues 8, 9 and 10. The damage issues are as follows:

11. What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Maria Ruiz and her husband, Ray Ruiz, for her injuries, if any, which you find from a preponderance of the evidence resulted in whole or in part from the use of the hose in question? Answer: $2,500.

(The court instructed the jury as to what elements of damages they could consider.)

12. Do you find from a preponderance of the evidence that wholly or partly as a result of the use of the hose in question, Otelia Menchaca was required to render nursing services to Maria Ruiz? Answer: We do.

Special Issue No. 13 was conditionally submitted:

13. What do you find from a preponderance of the evidence to be the reasonable value of the nursing services rendered to Maria Ruiz by Otelia Menchaca resulting in whole or in part from the use of the hose in question? Answer: $1,000.00.

14. Do you find from a preponderance of the evidence that wholly or partly as a result of the use of the hose in question, Otelia Menchaca was required to render maid services to Maria Ruiz? Answer: We do.

Special Issue No. 15 (conditionally submitted).

15. What do you find from a preponderance of the evidence to be the reasonable value of the maid services rendered to Maria Ruiz by Otelia Menchaca resulting in whole or in part from the use of the hose in question? Answer: $500.00.

The plaintiffs contend that an irreconcilable conflict exists between the jury's answers to special issues 8, 9 and 10, (finding that the hose was not a producing cause of the damages and injuries) and the jury's answers to special issues 11, 12, 13, 14 and 15 wherein the jury found that the plaintiffs were entitled to monetary damages "which resulted in whole or in part from the use of the hose in question". The plaintiffs argued that because of this conflict, the trial court should have granted them a mistrial. We disagree.

Special issues 11, 12, 13, 14 and 15 are damage issues and not liability issues. See Missouri Pacific R. Co. v. Whittenburg & Alston, 424 S.W.2d 427 (Tex.Sup.1968); Texas & Pacific Railway Company v. Van Zandt, 159 Tex. 178, 317 S.W.2d 528 (1958); Garza v. San Antonio Transit Co., 180 S.W.2d 1006 (Tex.Civ. App.–San Antonio 1944, writ ref'd w. m.); Wilkinson v. Southern Farm Supply Association, 409 S.W.2d 435 (Tex.Civ.App.– Amarillo 1966, writ ref'd n. r. e.). Special Issues 8, 9 and 10 submitted in conjunction with the prior issues (1, 2, 3, 6 and 7) were submitted to determine specifically and directly whether plaintiffs established liability on the part of the defendant. Special Issues 11, 12, 13, 14 and 15 were submitted and understood by the jury as value or damage issues. Missouri Pacific R. Co. v. Whittenburg & Alston, supra; Garza v. San Antonio Transit Co., supra. Because special issues 8, 9 and 10 are a part of the liability issues and 11, 12, 13, 14 and 15 are the damage issues, no irreconcilable conflict exists requiring a mistrial. Where special issues on liability are answered against a party, the answers to the issues on damages become immaterial. Garza v. San Antonio Transit Co., supra; Jones v. State Fair of Texas, 127 S.W.2d 948 (Tex.Civ.App.–Amarillo 1939, writ dism'd judgm. cor.); Gavrel v. Young, 407 S.W.2d 518 (Tex.Civ.App.–Houston 1966, writ ref'd n. r. e.); O'Neill v. Craig, 493 S.W.2d 898 (Tex.Civ.App.–Corpus Christi 1973, writ ref'd n. r. e.); Rampy v. Allstate Insurance Company, 492 S.W.2d 85 (Tex.Civ.App.–Austin 1973, writ ref'd n. r. e.). Since the damage issues are rendered immaterial by a failure to find specifically a producing cause, no conflict exists. Where there are *specific issues* on proximate causation such as those in 8, 9 and 10, the specific issues control over the general issues of causation in the damage issues. Therefore, an irreconcilable conflict does not exist. See Garza v. San Antonio Transit Co., supra; Benson v. Missouri, K. & T. R. Co., 200 S.W.2d 233 (Tex.Civ. App.–Dallas 1947, writ ref'd n. r. e., cert. den. 332 U.S. 830, 68 S.Ct. 206, 92 L.Ed. 403); Wilkinson v. Southern Farm Supply Association, supra; Barclay v. C. C. Pitts Sand and Gravel Company, 387 S.W.2d 644 (Tex.Sup.1965). Appellants rely on the case of Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985 (1949) for their proposition that an irreconcilable conflict exists between the liability and damage issues. However, Little

Rock is not directly in point with the case at bar. The two issues alleged to be conflicting in Little Rock were liability issues only. A trial court has the power to apply the reasonable construction which it deems proper and it was his duty to harmonize the findings of the jury if he could. For these reasons, appellants' first point of error is overruled.

Appellants' point of error numbers 2, 3 and 4 complain that the trial court erred in submitting special issues 8, 9 and 10 because there was no evidence to support a negative answer to said issues and the court should have found said issues in the affirmative as a matter of law. Special issues numbers 8, 9 and 10 being fully set out hereinbefore will not be repeated here.

In deciding no evidence points, the reviewing court should review the evidence in its most favorable light in support of the findings, considering only the evidence and inferences which support the finding and rejecting the evidence and inferences to the contrary. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1960); In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951); Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359 (1957). With this rule of law in mind, we consider only that evidence which is favorable to the verdict.

Otelia Menchaca testified that she had seen her mother light the stove and did not smell any gas and that she had crossed over the heater hose where it was connected to the stove to put some clothes in the closet. Mrs. Ruiz testified to the effect that when she first saw the fire, it was "where the connection to the heater on the wall is there in the closet" and that she saw the fire on the wall.

■ Milo A. Duden, an expert witness, called by the defendant stated that it was his conclusion that the fire started because the space heater was too close to the wall or some combustible object in the closet

near the rear of the heater. This evidence, circumstantial as well as direct, would be some evidence, weak as it may be, to support the jury's answers 8, 9 and 10. Appellants' points of error 2, 3 and 4 are overruled.

This brings us to the consideration of appellants' points of error 5, 6 and 7 which complain that the trial court erred in rendering and basing a judgment for the defendant on the jury's answers to special issues 8, 9 and 10 because the jury's negative findings of "We do not" to the special issues above, on which the plaintiffs had the burden of proof, were contrary to the great weight and preponderance of all of the credible testimony. To this, we must agree.

■ When it is urged that the jury's failure to find a fact is so against the great weight and preponderance of the evidence as to be wrong and unjust, the fact finding power of the Court of Civil Appeals is invoked. In such a case, we are required to weigh all of the evidence and to remand the cause for a new trial if we conclude that the verdict was so against the great weight and preponderance of the evidence as to be manifestly unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951); Parrish v. Hunt, 160 Tex. 378, 331 S.W.2d 304 (1960); Traylor v. Goulding, 497 S.W.2d 944 (Tex.Sup.1973).

George Green, an expert witness for the plaintiffs, was a mechanical and registered professional engineer. He had been a consulting and research engineer for a gas corporation. It was his opinion that the type of hose used by the plaintiffs was not safe for use on space heaters. He stated that you have almost a one hundred per cent (100%) certainty at some point in time that this hose will begin to leak because the rubber on the end tends to deteriorate and that it is certain to leak after a given period of time. The hose was introduced into evidence. On one end, it was burnt on the outside. Green testified "Now it is obvious to me, and there is no

doubt in my mind from looking at this hose, this hose was leaking gas at this fitting, and that leakage caused the burning of the hose on this end. . . ." He testified that in his opinion there was no way you could have a general fire in the area around the space heater and deteriorate one end of the hose to the extent that it was, without damaging and burning the other end. Mr. Green said: "This tells me, there was a large gas leak at this end right here and the burning of this gas is what caused the hose to burn on this end." He was then asked his opinion as to the cause of the fire and explosion. "Well, the gas leak from this hose was responsible for the fire in this room and was also responsible for the accumulation of gas in the other room which ultimately ignited after the fire started in this room." " . . . We always look up two things in a fire investigation, the source of the fuel and point of the ignition. Obviously since the ignition started by the stove the stove caused the ignition at that point where the gas leak was."

He was asked as to the possibility that the heater was turned up so high that it ignited some of the furniture, curtains or something in the room where it was sitting. He discounted this theory by explaining that there would have to be a gas leak to have caused the ultimate explosion. After the fire was brought under control, the only place the fire continued to flame up was right at the space heater. Green then pinpointed the gas leak to the hose in question when he testified in response to the question: " . . . would that be an explanation of the source of the fuel?" His answer was "Yes, sir. We know there was a leak there. If there was no leak on the hose after the fire then you could assume there was none before or during the fire. But the leak in it after the fire tends to support this theory."

Otelia Menchaca, the first one to see the fire, testified that when she first saw the fire, "it was located where the hose connected on to the heater; that it was a small fire right there where the hose connected on to the heater." She stated that she did not notice fire anywhere else in the room. The second person to see the fire was Maria Ruiz. She testified that she saw the fire "where the connection to the heater on the wall is there in the closet" and that the fire was "close to the heater over there".

The only disinterested witness was the fire marshall for the City of Victoria, George A. Sirman. He testified in detail about the physical facts he found at the time of the fire and after the fire had been extinguished. He testified that the hose in question had been burnt at only one end. It was his opinion that the hose with a $\frac{1}{2}$ inch opening had been connected over a pipe $\frac{5}{8}$ inches on the heater. It would not allow a tight fit and would permit the gas to leak. It was his opinion that had the hose had the proper connection on it, it would not have been leaking around the pipe. He was of the opinion that this type of hose was not reasonably fit for use as a connection between a fuel supply and a space heater.

The defendant's expert witness, Milo A. Duden, operated a testing laboratory for manufacturers of gas appliances. He was given certain facts concerning the fire and was asked the hypothetical question as to the cause of the fire to which he responded as follows:

"A Well, it's my conclusion that the fire we are talking about actually which I believe it originated in Otelia's bedroom, which is bedroom number two, and was caused by the ignition of a combustible object in the closet or on the wall adjacent to the top or near the rear of the heater. And during the course of the confusion that followed with people even attempting to extinguish the fire someone accidentally stepped on or struck the heater hose connecting to the heater causing the end of the hose adjacent to the heater to become disengaged from its fitting, or hose end nozzle, and

that raw gas then issued into the room and was later ignited causing the explosion Mrs. Ruiz heard some time after the fire started."

In support of his answer to the hypothetical question, witness Duden was asked to assume that Otelia testified that when she first came into the room and saw the fire, it was "on the right side of the heater as you look at the heater." However, Otelia's actual testimony was that when she first saw the fire "it was where the hose was connected to the heater." On cross examination and after being informed of this fact by plaintiffs' attorney, Mr. Duden qualified his conclusion as follows:

"Q  Your explanation as to how the fire caused to break out you have to ignore the testimony of one of the witnesses don't you? You have to ignore the testimony of Otelia she saw a fire right here where the hose was connected to the stove?

A  *I wasn't aware that is where she saw a fire.*

Q  If she saw a fire right there where the hose connected to the stove, and if that is a fact, it would change your conclusions as to the cause?

A  *If that is where she saw the fire it might change my conclusions."* (Emphasis supplied.)

Mr. Duden assumed that there had been confusion around the space heater after the fire had started. He further assumed that somebody stepped on or struck the heater hose; that it became disengaged from its fitting; that the disengagement caused raw gas to issue into the room which was later ignited; and that this is what caused the explosion. There was no evidence in the record that there was confusion around the heater or that anyone stepped on the hose, struck it or caused it to become disengaged. In fact, Otelia who had been the one who testified that she had stepped across the hose in going to the closet, testified that she did not step on it.

Witness Duden's conclusion as to the cause of how the fire and explosion occurred was based upon the circumstantial evidence that the space heater was close enough to the wall, to the closet, or to the clothes to ignite them. He then infers that during the course of the confusion after the fire had started someone must have accidentally stepped on or struck the heater hose thereby disengaging it from the fitting. This disengagement caused raw gas to escape in and fill up the room. The gas was then ignited by the fire previously started. The ultimate explosion was the result.

■ We recognize that there may have been sufficient facts to give rise to the conclusion that the wall or some combustible material behind the heater might have caught fire because of the proximity of the heater. But the subsequent vital facts necessary to prove the explosion may not be proved by unreasonable inferences from other facts and circumstances. See Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361, 363. It has been often said by our Supreme Court that a vital fact may not be established by piling an inference upon inference as would be required to arrive at the witness Duden's ultimate conclusion. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059 (1898); Schlumberger Well Sur. Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854 (Tex.Sup.1968); East Texas Theatres, Inc. v. Rutledge, 453 S.W.2d 466 (Tex.Sup.1970). A vital fact requires proof by evidence amounting to something more than a mere scintilla. A presumption of fact cannot rest upon a fact presumed.

Finally, Mr. Duden was asked: "If . . . this particular space heater had used a metal threaded end connection this fire might not have occurred, or at least, to the extent it did?" He said "Very possible". He was then questioned: "You wouldn't have had the explosion in any event?" Answer: "That's true."

Mr. Duden's conclusion as to the cause of the fire and explosion does not amount

to any evidence of probative value to support the negative answer "that the use of the hose in question was not a producing cause of the damages and injuries."

█ Special issues 8, 9 and 10 asked only whether the use of the hose with the space heater was *a producing cause* of the damages to the house, injuries to the plaintiffs and death to Yolanda. All of the witnesses for the plaintiffs and the disinterested witness testified that the hose was not only a producing cause, but the cause of the fire and explosion. Even the defendant's only witness testified that had a metal threader connector been used, the explosion would not have occurred. The jury was not at liberty to disregard all of this evidence. After considering all the evidence, we must hold that the jury's finding that the hose was not a producing cause of the damages and injuries is so against the great weight and preponderance of the evidence as to be wrong and unjust. This requires us to set aside the verdict and remand the cause to the lower court for a new trial.

The defendant in one of his cross points contends that the judgment of the trial court was correct because the plaintiffs were guilty of misuse of the product as a matter of law. In this connection, the defendant argues that the plaintiffs used the product in violation of the city ordinance of the City of Victoria prohibiting such use and this constituted a misuse and a proper defense. The defendant argues that the plaintiffs were persons who were prohibited by the terms of the ordinance from using the hose; that they did, in fact, purchase and use the hose, contrary to the ordinance; and they used the hose contrary to the instructions written on the hose even though such warning on the hose was held not to be an adequate warning. Citing McDevitt v. Standard Oil Company of Texas, 391 F.2d 364 (5th Cir. 1968) and Helicoid Gage Div. of Am. Chain & Cable Co. v. Howell, 511 S.W.2d 573 (Tex.Civ.App.–Houston [14th Dist.] 1974, no writ). We reject this theory.

█ To begin with, we must remember that contributory negligence does not bar recovery in a products liability case. Henderson v. Ford Motor Company, 519 S.W.2d 87 (Tex.1974). Defenses in a products liability case include misuse of the product and voluntary and unreasonable use in the face of a known danger—assumption of risk. Restatement of the Law Torts 2d § 402A Comment n (1965). If the misuse is based on the violation of an ordinance or a statute, it must depend on whether the purpose of the law was to afford protection against the hazard involved in the particular case at bar. There must be proof that the user knew or should have known of the occasion for compliance with the ordinance or statute. If the plaintiffs knew or should have known of the ordinance or statute and nevertheless proceeded voluntarily and unreasonably to make use of the hose in question and were injured and damaged by such use, they would be barred from recovery. See Restatement of the Law Torts 2d § 288A (1965); and see Henderson et vir v. Ford Motor Company et al., supra. No such issues were requested, submitted or answered by the jury. Defendant's cross points are overruled.

The judgment of the trial court is reversed and the cause is remanded for a new trial.