IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 



ON MOTION FOR REHEARING


 




NO. 3-91-466-CV





WILLIAM LEO KUHN AND PATTI CLARICE KUHN,



 APPELLANTS


vs.





PALMER A. GILLELAND,



 APPELLEE



 




FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT



NO. 14,447, HONORABLE ROBERT T. PFEUFFER, JUDGE PRESIDING



 




 On motion for rehearing, we withdraw our previous opinion and judgment dated
June 30, 1993, and substitute the following. 

 William L. Kuhn and his wife Patti C. Kuhn appeal from a trial-court judgment,
given on the jury's verdict, that they take nothing by their claim against Palmer A. Gilleland
under the Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§
17.41-.63 (West 1987 & Supp. 1994) ("DTPA"). We will affirm the judgment of the trial court. 
 

 In our previous opinion, we reversed the trial-court judgment because we held the
evidence conclusively established that Gilleland gave and breached an express warranty. DTPA
§ 17.50(a)(2). However, we omitted to address an apparent conflict in the jury's verdict regarding
the element of producing cause. In his motion for rehearing, Gilleland asserts we must resolve
this conflict in order to determine whether the jury found, or failed to find, that his alleged
wrongful conduct was the producing cause of the Kuhns' damages. He argues further that the jury
did fail to find in the Kuhns' favor on the issue of producing cause and thus it is immaterial
whether the evidence conclusively established that he violated the DTPA. See Knebel v. Port
Enters., Inc., 760 S.W.2d 829, 831 (Tex. App.--Corpus Christi 1988, writ denied) (observing that
jury's failure to find appellee's violation of the DTPA was the producing cause of appellant's
damages foreclosed recovery under DTPA). We agree.



THE CONTROVERSY


 On August 27, 1983, the Kuhns contracted with Gilleland for the construction of
a residence in Hays County. For a fee of $10,776, Gilleland promised to supervise construction
of the house according to certain plans and specifications included in the contract. 

 Patti Kuhn suffered from health problems allegedly caused by sensitivities to
environmental chemicals. The plans and specifications required the use of Negley's paint inside
the house because that paint was free of pesticides or fungicides. In fact, Devoe latex paint, an
ordinary house paint containing pesticides and fungicides, was applied to the interior of the house. 
After the Kuhns moved into the house on February 1, 1984, Patti Kuhn allegedly experienced a
severe allergic reaction to the paint. Consequently, the Kuhns brought this action for Gilleland's
alleged violations of the DTPA. 

 The questions submitted to the jury, and its responses, were as follows: 



QUESTION NO. 1


 Did Palmer Gilleland engage in any false, misleading, or deceptive act or
practice that was a producing cause of damages to Bill Kuhn or Patti Kuhn?


 Answer: NO.


QUESTION NO. 2


 What sum of money, if paid now in cash, would fairly and reasonably
compensate William Kuhn and Patti Kuhn for their damages, if any, for which
Palmer Gilleland's conduct was a `producing cause' as defined in Question No.
1?


 Answer: [$27,605 for various elements of damages].



(emphasis added) (definitions and instructions omitted).

 Both jury questions incorporated the element of producing cause, and the jury's
verdict appears to conflict on that issue. In Question No. 1, the jury failed to find Gilleland
engaged in a deceptive trade practice that was a producing cause of the Kuhns' damages. Yet the
jury awarded damages in response to Question No. 2, which specifically inquired about the
Kuhns' damages for which Gilleland's conduct was a producing cause. 

 After the trial, the Kuhns filed a motion to disregard the jury's response to
Question No. 1. They asserted the evidence conclusively established that Gilleland's conduct
constituted a deceptive trade practice and requested that the court make an express finding to that
effect. Further, they argued that the finding of damages in Question No. 2 constituted a finding
that Gilleland's wrongful conduct was the producing cause of the Kuhns' damages. The Kuhns
requested that the court render judgment in their favor based on the jury's finding of damages in
Question No. 2, or, in the alternative, grant them a new trial. The trial court declined, rendering
a take-nothing judgment on the jury's verdict. This appeal ensued.



DISCUSSION AND HOLDINGS


 The Kuhns contend in their second point of error (1) that the jury's finding of damages
in Question No. 2 was an affirmative finding of producing cause, and is the controlling finding
on that issue. They assert the jury's response of "No" to Question No. 1 was "ambiguous" on
the issue of producing cause. Specifically, they argue that it is unclear whether the jury (1) found
that Gilleland violated the DTPA, but failed to find such violation was the producing cause of the
Kuhns' damages, or (2) failed to find Gilleland violated the DTPA, and therefore did not reach
the issue of producing cause. The Kuhns argue that when findings conflict, a specific,
unambiguous finding such as that under Question No. 2 controls over a general, ambiguous
finding such as that in Question No. 1. Gilleland asserts that an answer to a specific-liability
question, such as Question No. 1, controls over the jury's response to Question No. 2, a general-damages question. We agree with Gilleland.



Specific-Liability Findings Control


 A court has a duty to reconcile apparent conflicts in jury findings if it is possible
to do so on a reasonable basis in light of the pleadings and evidence, the manner of submission,
and the other findings considered as a whole. Bender v. Southern Pac. Transp. Co., 600 S.W.2d
257, 260 (Tex. 1980); see also Producers Chem. Co. v. McKay, 366 S.W.2d 220, 224 (Tex.
1963). We must presume the jurors did not intend to return conflicting answers. Huber v. Ryan,
627 S.W.2d 145, 146 (Tex. 1981) (citation omitted).

 When a jury fails to make an affirmative finding of liability, the damage question
becomes immaterial. Ruiz v. Flexonics, 517 S.W.2d 853, 856 (Tex. Civ. App.--Corpus Christi
1974, writ ref'd n.r.e.); Garza v. San Antonio Transit Co., 180 S.W.2d 1006, 1009 (Tex. Civ.
App.--San Antonio 1944, writ ref'd w.o.m.). Since the damage issue is rendered immaterial, no
conflict exists between the jury's failure to find liability and its award of damages. Ruiz, 517
S.W.2d at 856. This is true even if the damage issue appears to incorporate the element of
causation. In Ruiz, the jury failed to find, in response to three special issues, that a defective hose
was the producing cause of the plaintiffs' damages. Id. at 854. However, the jury fixed damages
in response to five issues inquiring what sum of money would compensate the plaintiffs for
injuries which "resulted in whole or in part from the use of the hose in question[.]" Id. at 855. 
The plaintiffs argued that the jury's failure to find producing cause in response to the three special
issues conflicted with its finding of damages in response to the five special issues that incorporated
causation. Id. at 856. The court disagreed, reasoning that the special issues on producing cause
were submitted to determine specifically and directly if the plaintiffs had established liability. Id. 
Therefore, the specific issues on producing cause controlled over the general-damage issues that
included causation. Id. 

 The Kuhns attempt to distinguish Ruiz on the ground that the damages issues in that
case used the term "resulting" and not the more specific term "producing cause" as does Question
No. 2 in the present case. Specific-liability questions control over damage questions, however,
regardless of the terminology in the damage question. See Wilkinson v. Southern Farm Supply
Ass'n, 409 S.W.2d 435, 438-39 (Tex. Civ. App.--Amarillo 1966, writ ref'd n.r.e.). In Wilkinson,
the plaintiff alleged several acts of negligence. Id. at 436. Through answers to a series of special
issues, the jury either failed to find the defendant negligent or failed to find that his negligence
was a proximate cause of the plaintiff's injuries. Id. Yet the jury fixed damages in response to
questions asking what amount of money would compensate the plaintiff for injuries
"'[p]roximately caused by the negligence, if any, of the defendant.'" Id. at 438. The plaintiff
argued that the jury's response to these damage issues established that the defendant was negligent
and that his negligence proximately caused the damages. Id. The court held the liability issues
were definite and specific and controlled over the general-damages issues. Id. at 438-39; see also
Dobbins v. Gardner, 402 S.W.2d 804, 805-06 (Tex. Civ. App.--Houston 1966, writ ref'd n.r.e.)
(holding jury's failure to find defendant's negligence was proximate cause of injuries in response
to a specific issue controlled over award of damages in response to a damages question
incorporating proximate cause); Garza, 180 S.W.2d at 1009 (holding jury's failure to find
defendant negligent in response to a specific issue controlled over award of damages in response
to question incorporating negligence and proximate cause). 

 In their reply to Gilleland's motion for rehearing, the Kuhns assert that the deciding
principle in the above cases was that a specific and exclusive finding of no fault alone or no
causation alone prevails over a more general and ambiguous finding. The opinions do not
indicate, however, that the jury's failure to find must be separate and exclusive on fault and
causation in order for liability questions to control. In effect, the Kuhns argue that if two or more
elements of a cause of action are combined and submitted to the jury in a broad-form question,
and the jury fails to find liability, such a response is general and ambiguous. 

 The supreme court has specifically approved jury questions containing more than
one element of a cause of action. See, e.g., Lemos v. Montez, 680 S.W.2d 798, 799 (Tex. 1984)
(noting it is permissible to submit elements of negligence and proximate cause in a single issue). 
Moreover, the 1988 revision of Texas Rule of Civil Procedure 277 reduced the scope of a trial
court's discretion to submit separate questions with respect to each element of a case. See Texas
Dep't of Human Servs. v. E.B., 802 S.W.2d 647, 649 (Tex. 1990). (2) The supreme court has stated
that Rule 277 unequivocally requires broad-form submission unless extraordinary circumstances
exist. Id. at 649. 

 Given this mandate to combine elements in a single question, the Kuhns' argument,
that the jury's response of "No" to Question No. 1 is ambiguous on producing cause, cannot
prevail. Question No. 1 was submitted to determine specifically and directly if the Kuhns had
proven Gilleland's liability. The jury's failure to find Gilleland had engaged in a deceptive-trade
practice that was the producing cause of the Kuhns' damages rendered immaterial the jury's
response to the general damages issue. We overrule the Kuhns' second point of error. 


 

Jury's Failure to Find Producing Cause


 In their third and fourth points of error the Kuhns contend the jury's failure to find
(in response to Question No. 1) that a DTPA violation was the producing cause of their damages
was against the great weight and preponderance of the evidence; alternatively, they assert that
producing cause was conclusively established. However, the Kuhns state they do not challenge
the jury's failure to find Gilleland's wrongful conduct was the producing cause of Patti Kuhn's
allergic reaction. Instead, they attack the jury's failure to find that use of the wrong paint was
the producing cause of their mental-anguish or contract damages, separate and apart from Patti
Kuhn's physical reaction. 

 In response to Question No. 1, the jury failed to find Gilleland's alleged wrongful
conduct was the producing cause of any of the Kuhns' damages. The Kuhns apparently accept
this part of the verdict as it relates to their claim for damages based upon Patti Kuhn's allergic
reaction. They challenge, however, the jury's failure to find that Gilleland caused at minimum
their mental-anguish and contract damages, arguing that such damages are independent of Patti Kuhn's physical injuries. The substance of their contention, as we understand it, is that the jury's
failure to find that Gilleland caused Patti Kuhn's physical injuries has no effect on their claims for
contract and mental-anguish damages. Gilleland rejoins that the sole basis for this lawsuit was
Patti Kuhn's alleged allergic reaction to the paint, and therefore the only issue concerning
causation is whether Devoe paint was the producing cause of an allergic reaction in Patti Kuhn,
all claims for damages being a consequence of that reaction. We agree.

 Parties are restricted in an appellate court to the theory on which the case was tried
in the lower court. Safety Casualty Co. v. Wright, 160 S.W.2d 238, 245 (Tex. 1942). We must
therefore review the pleadings, the evidence, and the manner of submission in order to determine
the Kuhns' theory of the case at trial. See, e.g., Sorrells v. Coffield, 187 S.W.2d 980, 980-81
(Tex. 1945) (reviewing pleadings, proof, and jury submission and confining plaintiff to his trial
theory regarding terms of alleged oral contract); Safety Casualty Co., 160 S.W.2d at 244-45
(holding petition, proof, and submission to jury revealed plaintiffs' theory that decedent was
injured while voluntarily repairing bus, not while traveling as bus passenger to his job; thus
decedent not within scope of employment). If the Kuhns tried the case on the theory that their
contract and mental-anguish damages were the consequence of Patti Kuhn's allergic reaction to
the paint, they are confined to that theory on appeal. 

 The following is a review of the Kuhns' petition and evidence at trial, and the jury
charge. 

 In their fifth amended original petition the Kuhns alleged:



4. Due to the health of PAT KUHN, specifically her chemical sensitivities and
immune system damage and/or autoimmune disease, and other reactions to
environmental chemicals, especially to regular latex paint, the plans and
specifications for said house provided that non-toxic materials were to be used in
construction of the house, as specified by Plaintiffs. As part of said contract
Plaintiffs specified . . . the use of many non-toxic or hypo-allergenic materials,
including . . .


 a. Negley's "non-toxic" or "low biocide" paint, i.e. without added biocide.




The petition claimed damages for the following: 

 (1) Patti Kuhn's severe allergic, psychological, and immune reactions to the house. 
Soon after moving into the house she required hospitalization for ten days. Her severe reaction
has aggravated her sensitivity to chemicals and foods, and has prevented her from going into many
public places. Because she could not tolerate living in the new home, she had to live six months
on the back porch without heat or air-conditioning while awaiting construction of a "safe room." 
She is unable now to work as a real estate agent and her relationship with her husband has
deteriorated. She suffered extreme mental anguish in being deprived of the use of her new home
while her husband lived in it.

 (2) William Kuhn's derivative injuries. He sustained extreme mental anguish and
stress because of Gilleland's wrongful conduct and the resulting injuries to his wife. He has
suffered a loss of consortium because of his wife's injuries. All of the foregoing contributed to
his suffering a heart attack.

 (3) The Kuhns' financial losses. The Kuhns sought recovery of $14,000 as the cost
of building the "safe room" in addition to the following: the cost of living in a motel and storing
their furniture while Gilleland attempted to remedy the problem; the cost of new furniture because
their furniture had been contaminated by exposure to the improper paint; and the loss of rental
value of the house, in which two tenants had been made sick. 

 At trial, the Kuhns introduced the following evidence: 

 Palmer Gilleland, called by the Kuhns, testified that the specifications for the house
included several "non-toxic" items, including Negley's paint. He stated that Patti Kuhn told him
she had allergies, and required him to use certain non-toxic materials in building the house. He
also testified concerning his recollection of Patti Kuhn's conversations with the painter, Benny
Silva. Gilleland believed Patti Kuhn told Silva about the importance of Negley's paint. The
Kuhns' counsel questioned Gilleland as to certain conversations he had with the Kuhns about
special ordering the Negley's paint, about his presence at the house during the painting, and about
the removal of paint cans from the premises after the painting. Gilleland further testified about
events that occurred both during construction and afterwards, when the Kuhns moved into the
house and discovered the wrong paint had been used. 

 Patti Kuhn testified about her various chemical sensitivities, including pesticides
and certain foods, but focused particularly on her reaction to paint. She listed many painful
symptoms which allegedly lasted for several days after she was exposed to paint. She
distinguished her reactions to freshly painted surfaces as opposed to "old paint." She described
incidents when she had a strong reaction to a particular place and later discovered it had been
recently painted or redecorated. She testified about the numerous doctors she had visited, and
described the allergy-testing process in great detail. She listed various means she had employed
to control her autoimmune reaction to paint, including virtually living in a "safe room" for several
years. She testified that when she had a severe reaction to paint she became depressed and
suicidal. She stated the Kuhns sold their old house because her doctor told her she had "poisoned"
it by painting the structure. 

 Continuing, Patti Kuhn said she spent a year researching non-toxic building
materials after she and her husband decided to build a new house. When they contracted with
Gilleland, she communicated to him the importance of using Negley's non-toxic, non-allergenic
paint. She described in detail her symptoms from her reaction to the house, what she did to cope
with the problem, and her subsequent hospitalization. She related that many items in the new
house were apparently contaminated by the latex paint, and she could not tolerate being around
them no matter how Bill Kuhn attempted to "detox" them. She stated Bill Kuhn had done all the
housework while she lived in the "safe room" and that she had no social life because she had
severe reactions to the homes or restaurants she visited. 

 Concluding, Patti Kuhn testified that after several years in the new home, the
Kuhns moved to a different house. She stated they attempted to rent the custom-built home, but
two different tenants became ill while living there. She also testified that her condition has put
a tremendous amount of stress on her husband, which she believed contributed to his heart attack.

 Dr. Robert Prall, a psychiatrist, testified that he had examined Patti Kuhn. He
stated his opinion that Patti Kuhn was suffering from a reactive depression due to the
contamination of her home and the subsequent pain and suffering she experienced. He said that
Patti Kuhn's reaction to the house had psychological components in it, but mainly her reaction was
an allergic response to the house. He further testified that Patti Kuhn had carefully planned the
new house to be non-toxic, and had a terrible reaction of emotional distress when she experienced
the allergic reaction to the new house. When the Kuhns' attorney inquired whether the paint
caused Patti Kuhn's depression, he stated that the paint caused symptoms, and the symptoms
caused the depression. 

 John Stefanowicz, a contractor, testified that the cost of removing all the sheetrock
and all the sources of paint with biocide in it would be approximately $31,200, including moving
and storing furniture.

 Jack and Lillian Stiles managed the Country Club Apartments, where the Kuhns
lived in 1982 before moving into the custom-built house. Mrs. Stiles testified that Patti Kuhn had
requested that her apartment not be painted or exterminated because she was allergic to the paint
and extermination chemicals. She recalled that a storm blew down a fence near the Kuhns'
apartment, and when it was repainted, the Kuhns complained and Patti Kuhn became very ill. 
Jack Stiles testified concerning the same events. 

 Jeanine Cook Pool testified she had served on the architectural control committee
of the resort where the Kuhns' home was located. The committee approved the initial plans for
the home. Mrs. Pool stated that after the house was built, the committee reviewed a plan to
enclose the porch because the Kuhns said the paint in the new home had made Patti Kuhn ill. She
further testified that Patti Kuhn had attempted to do volunteer work on the maintenance fund, but
had an allergic reaction to the paint in the office and had to leave. 

 Clarence Monroe Woodley, Patti Kuhn's son from her first marriage, testified he
and his brothers helped build the "safe room" and fixed some electrical wiring problems in the
new house. He stated he spent about four weeks working on the house, and during that time,
observed that his mother was not feeling well.

 Carol Staelin testified her house was painted with Negley's paint, and Patti Kuhn
had visited there without complaining of a paint reaction. 

 Arthur E. Davis, a specialist in paint and its ingredients testified by deposition that
the biocide or in-can preservative added to Devoe paint is Dowicil 75, in the amount of 5.9 grams
per gallon.

 Dr. Walter Sjoberg, Jr., M.D., an internal-medicine specialist, testified by
deposition that Patti Kuhn had been his patient since 1979 and that he had treated her numerous
times, including treatment after her difficulties with the new home. He testified extensively about
her medical history and symptoms, both before and after she moved into the new home. He stated
that with patients having autoimmune responses similar to Patti Kuhn's, he is rarely able to
determine the cause of the problem. 

 Alfred Richard Rowe, who worked as a paint chemist for Negley's Paint Company
for several years, testified by deposition concerning the composition of Negley's paint. Thomas
W. Fitzgerald, the plant manager for Negley's Paint Company, testified by deposition about
Negley's practice of excluding biocide or fungicide from its paint.

 Dr. Alfred Johnson, a practitioner of environmental medicine, testified by
deposition that he first saw Patti Kuhn in August of 1984. He described the treatment and
diagnosis of environmentally sensitive people generally, and Patti Kuhn specifically.

 Arena Hoagland testified she had known the Kuhns for several years. She related
what she observed concerning Patti Kuhn's paint reactions.

 Donald Ray Crawford, a real estate appraiser for the FHA, testified by deposition
concerning the value of the custom-built home. He testified that, to average buyers, there would
be some increased value of this house only if they preferred tile over carpet, and possibly they
would pay an extra couple of thousand for the feature of the house if it were chemical-free. He
had no idea what an allergy sufferer would pay for a chemical-free house. 

 Dr. Martha Strickland testified by two videotaped depositions, taken a few years
apart. She stated she was a practitioner of allergy and environmental medicine, and that her
practice involved testing patients for sensitivities to substances. She described at great length the
test she administered to Patti Kuhn in 1986 using painted panels. She described the effect of
exposure to a toxic substance on the immune system. Dr. Strickland further testified about
another round of testing conducted in May 1988, in which Patti Kuhn was tested for sensitivity
to the house. Dr. Strickland stated there was a psychological component to Patti Kuhn's
reactions, in that she seemed to be affected by whatever she thought would bother her, and that
in Dr. Strickland's opinion, she no longer reacted to the house in 1988. She further testified that
if Patti Kuhn had initially had some bad reactions to the house, and therefore thought she would
react to it each time she went in it, she was perhaps suffering from post-stress syndrome. Dr.
Strickland stated that in her opinion Patti Kuhn's current allergic reaction to the house was an
emotional reaction. 

 William Kuhn testified by deposition concerning his wife's symptoms over the
years and their visits to various doctors in order to discover the source of the problem. He related
conversations with Gilleland before the house was built regarding the use of non-allergenic
building materials, particularly Negley's paint. He testified about their discovery that Devoe paint
had been applied and an attempt to apply Negley's paint over the Devoe paint. He described his
wife's physical reaction to the house and to other places that had been painted, her attempts to
alleviate the symptoms by staying on the porch, her hospitalization, and his attempts to work with
Gilleland on the problem. 

 The record does not contain the Kuhns' jury argument. The case was submitted
to the jury solely as a DTPA cause of action. In Question No. 2 the jury was instructed to
consider the following elements of damage: (1) for William Kuhn, both past and future mental
anguish, loss of Patti Kuhn's household services, and loss of consortium; (2) for Patti Kuhn, both
past and future physical pain, mental anguish, and past physical impairment; (3) the cost of
constructing a safe room; (4) the costs necessary to repair or tear out and reconstruct the house
to make it safe for Patti Kuhn in compliance with the construction contract; (5) the cost of storage
for furniture while the house was painted over with Negley's paint in 1984; (6) the cost of
replacement of furniture and other personal property which Patti Kuhn can no longer tolerate; (7)
the reasonable value of loss of use of the house from 1984 to 1989; (8) the loss of rental value of
the house; (9) the cost of moving from the house in 1989; (10) the difference in market value of
the house as delivered and the value it would have had if built as planned; and (11) hospital and
medical expenses in the past. 

 As should be apparent from the above summary, the record in this cause is quite
extensive, containing eleven volumes of testimony, seven volumes of exhibits, and two videotaped
depositions the jury viewed. After reviewing the petition, the testimony of the Kuhns' witnesses,
and the jury charge, we are convinced the Kuhns tried the case on a theory that Patti Kuhn had
a severe physical reaction to the Devoe paint in the new home and that the Kuhns' other damages
were consequences of this reaction. In light of the evidence summarized above, the jury would
have understood the central issue to be whether Patti Kuhn suffered a paint reaction and
considered Question No. 1 accordingly. The Kuhns, however, argue that they proved their
contract and mental-anguish damages independently of Patti Kuhn's physical injuries. 

 First, the Kuhns assert, they proved that Gilleland's alleged DTPA violation was
the producing cause of their contract damages. Specifically, they refer to the cost of removal of
all traces of the toxic interior paint by tearing out the sheetrock walls and repainting with non-toxic paint, as well as storage of furniture, alternate rooming, and loss of use of the house during
the proposed reconstruction. They further claim that they are at least entitled to damages for the
cost of applying a second coat of Negley's paint, in addition to the one coat applied in an
unsuccessful attempt to seal the Devoe paint. 

 We note that the only one of the above elements of damage that was submitted and
thus considered by the jury was the cost of reconstruction. Further, the cost-of-reconstruction
element reads as follows: "The costs necessary to repair or tear out and reconstruct and/or
refinish the house in order to make it safe for Patti Kuhn and reasonably in compliance with the
terms of Defendant's contract." (emphasis added). The wording of this element explicitly states
the Kuhns' theory that the need for reconstruction arose from Patti Kuhn's alleged allergic
reaction to the paint. 

 Second, the Kuhns contend the testimony of three expert witnesses proved that the
use of Devoe paint caused them mental anguish independently of Patti Kuhn's allergic reaction. 
It is true that a party may recover mental anguish damages in the absence of physical injury. 
Boyles v. Kerr, 855 S.W.2d 593, 598 (Tex. 1993). However, our review of the testimony reveals
that all three witnesses stated that Patti Kuhn's mental stress and depression were not independent
of her allergic reaction. Dr. Martha Strickland testified that Patti Kuhn was perhaps suffering
from post-traumatic stress disorder from the use of incorrect building materials in the house. 
However, she stated that this was based on Mrs. Kuhn's original severe allergic reaction and
subsequent expectation that she would react each time she entered the house. Dr. Robert Prall
testified that Patti Kuhn was suffering from reactive depression in response to the problems with
the house, but he explicitly stated that the paint caused physical symptoms and that the symptoms
caused the depression. Dr. Walter Sjoberg testified that Patti Kuhn suffered a reactive depression,
but stated that it was in response to her illness. 

 Based on our review of the record, we conclude that the Kuhns' only theory at trial
was that the wrongful use of Devoe paint was the producing cause of Patti Kuhn's allergic reaction
and that the Kuhns' other damages were consequences of this reaction. Thus, the issue of whether
Gilleland caused their contract and mental-anguish damages, separate and apart from Patti Kuhn's
allergic reaction, was never before the jury. The Kuhns may not circumvent the jury's failure
to find in their favor by raising sufficiency challenges to an issue that was not tried in the court
below. See Settegast v. Martin, 154 S.W.2d 299, 301 (Tex. Civ. App.--San Antonio 1941, no
writ) (holding appellant may not, after case is tried and lost on one theory, change theory on
appeal). We overrule the Kuhns' third and fourth points of error.



CONCLUSION


 Because we hold the jury failed to find in the Kuhns' favor regarding the element
of producing cause, we do not address their first point raising legal and factual sufficiency
challenges to the jury's failure to find that Gilleland violated the DTPA. In light of our
disposition of the Kuhns' second point of error, we do not address their fifth point asserting the
trial court erred in not rendering judgment in their favor based on the jury's response to Question
No. 2. 

 Finding no error, we affirm the trial-court judgment.



 

 John Powers, Justice

Before Justices Powers, Aboussie and B. A. Smith

Affirmed

Filed: February 23, 1994

Do Not Publish
1. In our previous opinion we sustained the Kuhns' contention
that the evidence conclusively established Gilleland violated the
DTPA. We did not address their arguments pertaining to the jury's
verdict on the issue of producing cause. We now address the Kuhns'
second, third, and fourth points of error regarding the issue of
producing cause.
2. Before its 1988 amendment, rule 277 provided in part as
follows: "It shall be discretionary with the court whether to
submit separate questions with respect to each element of a case or
to submit issues broadly. It shall not be objectionable that a
question is general or includes a combination of elements or
issues." 36 Tex. B.J. 495, 496 (1973). Rule 277 currently
provides: "In all jury cases the court shall, whenever feasible,
submit the cause upon broad-form questions." Tex. R. Civ. P. 277.